Good morning, Mr. Bailent. Good morning, Your Honors. My name is David Bailent. I'm representing the plaintiff in this case, the appellant. I'd like to reserve a couple of minutes at the end. The bell on the clock will try to help you. Okay, give me the bell. The essential question in this case is are there issues of material fact under summary judgment standards, whether AMPAC's UIM claims adjusting handling was reasonable or was frivolous or was unfounded. The term reasonable, if we just put it out there in the air, is kind of ambiguous because what's reasonable to me might not be reasonable to somebody else. And that's the way it's used sort of ambiguously throughout the briefing that AMPAC submitted. But what it really means in the insurance adjusting world is conforming with established standards or rules. There are rules which govern bereft of standards in claims adjusting. If there weren't any standards, then any insurance company could argue that what they were doing or failed to do was reasonable or unreasonable. It's too vague. But there are well-established standards in Washington and elsewhere on claims adjustment. It's by statute, by regulations, in other words, by industry standards, which was well briefed in the summary judgment cases, I should say, below here, and by AMPAC's own claims adjustment standards. Yeah, I followed your chronology of events in this claim. Okay. And my question is, at what point do you contend that AMPAC had sufficient information that it was required to pay the $100,000? Where was that point? I'm glad you asked because the time period here is crucial and cuts out a lot of the underbrush in the case. The essential time period for this is, and this is probably the most important issue, is April 21, 2015. That's the point? That's the point. Two days later, the lawsuit was filed and we're in a different sphere. But April 21, 2015 was the point at which AMPAC made its offer of $25,000 new money. But counsel, with respect, as I understand this record, there was, if you will, a dialogue between you and AMPAC's people. They made offers. You didn't respond. They ask you for authorization to review your client's medical record. You didn't respond. You basically kept putting them off, putting them off, putting them off, and then finally threatening to file the action. I also struggle with the fact that I don't see where it was clear that AMPAC knew or should have known that the claim in the aggregate with the earlier with a century and what had already been paid to you was valued in excess of $210,000. So from my perspective, and I hope you can help me with this, looking at the industry standard, the question for a in this case AMPAC, to be required to make an additional tender when it didn't have essential information that it was entitled to under the documents themselves as well as under the law. And you basically weren't negotiating. You're just saying, I want this, or they would offer other and you wouldn't respond. I apologize for what I just said because you didn't say anything. They made an offer. You didn't respond. You were the great sphinx. How is that reasonable? I kind of agree with you. I apologize to AMPAC for some of the delays that were here. But that's why the judge's question is so crucial, is because with all the delays, the question still is by the time before suit was filed, what information did they have or should they have had that they could have made a reasonable evaluation of the claim? Did they have all of the medical records that they had requested at that point? Okay. What they had here was, and there's a chart in the record that shows all this. I did it day by day, each entry of each medical care. They had by the time of the lawsuit was filed, they had their own records that they had secured directly from the medical providers which were part of their file on part of the PIP adjustment. They had a complete set of records. They were missing a couple of dates of the chiropractor's records, but that's really it. Treatment was basically over by then. They had those records. In the demand package, which was sent out in mid-April 2014, they had another set of records. Now, I didn't have the chiropractic records. I didn't even know that there was a chiropractor at that point in time, but they did. They had those records already in their file. They had paid part of it as part of their PIP adjustment. Are you contending that ANPAC, as an insurer, investigating a claim like this isn't allowed to investigate inconsistencies? I think in the letter you sent them, there were some inconsistencies from what's in the records. In your letter to them, you talked about her being suicidal. You talked about a brain injury, I think a brain bleed from the diagnostic studies. Those didn't pan out and those weren't part of what could be related to this accident. In any flux situation, there's a lot of ins and outs, but here's why that's not quite correct. To answer the further question, they had available to them a third set of records, which they had got directly from the providers, admittedly after a delay for which I apologize, but they had by early 2015 a whole other set of records. Did you object to the IME, though? Do you think that was inappropriate for the carrier to ask for an IME? I think it's appropriate to ask what the reasonable basis for why they wanted an IME. The policy says they had to have a reasonable basis for it, and they just said do it. They asked me how high. They wanted me to jump and they wanted me to ask just how high, but that wasn't the issue. What happened then, just to talk about the suicidal aspect, the ANPAC had available to them. They never saw it. The adjuster never saw it. The adjuster never reviewed the third set of medical records because they didn't make it to the claims file. Whose records were those, the third set of records? Directly from the providers, all the providers. The ANPAC had secured. Okay. You say a third set, though. I mean, we're talking about records from individual providers. Was there an individual provider they didn't receive? There was one individual provider that I refused to allow them to have because it was unrelated, which was a psychiatric help for the children. And the other provider that I didn't even know about was because a horse stepped on her hand late after the case, which had nothing to do with the case. So they didn't have those two records. But they had the original set of medical records directly from providers on PIP. They had the set of records I provided. One of the things that's interesting here is, is a lawyer really going to mislead an insurance company by doctoring their records? And I've been at it for 44 years. I wouldn't endanger my bar permit. But then they got a third set of records. After we signed the permit to do that, they got a third set of records, again, directly from all the providers. So they had the three sets of records. But what they also had, just addressing some specifics on the suicidal aspect, they had a three and a half hour deposition, examination under Ruth Jelinek. Again, that never made it to the claims file. It was never reviewed by the claims adjuster. Well, there's a summary of it, though, wasn't there, that went to the adjuster? A four-line summary saying she cried a lot and she claimed she hadn't had no concussions. But we're talking here about the reasonableness of evaluation of a claim. Is it reasonable to ignore three and a half hours of testimony where she detailed in exquisite detail her harms and that she was suffering from this brain damage? Is that reasonable, to ignore that? Is it reasonable to ignore medical records that they have in their file? Was there specific information in that statement she gave that you feel should have been evaluated but wasn't? All of it. I mean, she discussed how she was not able to function on a daily basis. In my reply brief, I think I put that in there. She was not able to function on a daily basis. All the elements of mild traumatic brain injury were detailed for AMPAC to have available. They didn't even ask for it. The adjuster never saw it. The adjuster never saw the third set of medical records directly from providers. How is that reasonable evaluation? At the time that you claim the insurance company should have known that it had to pay more, did they have all the evidence that they had requested regarding your client's fall on two occasions in the four to six year period prior to the accident where she struck her head? They had all the information. What the trial judge had available to him is the testimony of the adjuster, the testimony of the claim supervisor, the testimony of the insurance expert that AMPAC had hired. Based on the same set of records that AMPAC had throughout, they could find no evidence of concussion, no evidence of clinical anxiety, no evidence of any of the symptoms that she was having or treatments for them. Let me be sure I have your answer. Did they have, with respect to those two prior falls where she hit her head, did the insurance company have all of the records or other information that they had requested from you at the time that you say they should have known that they needed to pay more? Yes. They had all of the records. When the Jelenics moved to Washington, they established care with Dr. Cote as a primary care doctor in 2005. AMPAC had all of those historical records. It was all there for them. It was all laid out. Weren't there some of the records that indicated that she did have some prior concussions in prior falls? None. As the judge has said, there were incidents where she admitted that she had bumped her head. There was never any treatment for it. There was never any sequela to that, and it was years old. That's my point. The records do reflect history, at least provided by your client. There's a big difference between bumping your head, which we all do, and a concussion which has sequela for brain damage. They had all the same information that they had at the end. The same information was evaluated by the three people I just indicated. In fact, the court found that there was no dispute about the fact that she was suffering from post-concussive syndrome, and it arose from this claim. I'm not saying they couldn't have investigated it, but all they had to do was look at the records to see that there was no treatment for any of these things. I want to go back to the IME for a second. Did you fault AMPAC for requesting an IME? It never happened, and I can't understand for the record why it didn't happen. It didn't happen before the critical time period. It did happen eventually, but what I was asking for is a reasonable basis for it, because we had a clinical neuropsychologist who had tested her and found the brain damage deficits. It wasn't somebody I hired. It was a treating neuropsychologist before I got involved in the case. Let me be sure I didn't talk about the same person. What I was referring to is October 15, 2013, there was a neuropsychological evaluation by Karen Sanders, a medical doctor, and your client related that two occasions in the previous four to six years, she fell off a horse, struck her head. This is not just banging against the wall. She fell off a horse and hit her head. People die from that sort of thing, so it's not exactly a strange request to want to know what the impact, if any, was. Right, but there were no effects of that that she ever had, and in fact, if you go on to the Dr. Sanders neuropsychological evaluation, she says there are no relevant prior incidents. So is it your representation to the court that in the record, there is nothing that says that these earlier falls had any impact on your client's mental and physical status? Right. I am saying on the record, and I am also stating as a fact that ANPAC knew that because all three of the people involved on their side admitted it, that there were no evidence of prior concussions or prior brain damage. Okay. You wanted to save some of your time, so . . . I had one last question. I'm going back to the IME again. Was ANPAC still pressing for the IME when you filed the lawsuit? Yes. Okay, thanks. We'll give you a little extra time since we asked you a question. Ms. Coe. Good morning, Your Honors. May it please the Court, I'm Jennifer Coe. I represent ANPAC, the appellee. Let me just jump right in to a couple of the questions that were raised with Mr. Bailent. First of all, when we're looking at what ANPAC wanted to know at the time it was making its offers, what ANPAC wanted to know is what is Ms. Jelinek's condition currently, and has it changed since Dr. Sanders said in October of 2013 when she said that she had mild post-concussive syndrome complicated by anxiety and depression that should resolve within the year, so within the year 2013. At the time the UIM claim was made in July of 2014, she was not, as far as we could tell from the medical records, she was not pursuing any kind of treatment, and in fact had not reported any treatment in that packet since February of 2014. So the disconnect the adjuster was looking to resolve is how is she now? Is this a permanent injury? Are there still the troublesome symptoms that she's been talking about? And then so we asked for it. First of all, ANPAC offers $10,000 in August. Let me just ask you quickly, what investigation was ANPAC doing at the time the lawsuit was filed in April of 2015? ANPAC was attempting to investigate her current condition, both her report of her condition that would be covered by the EOU, EUO, and then also any medical opinion as to her current condition, any treatment that she was receiving at the time to her current condition, and that would be the IME. So on the one hand, when Dylan Jackson said, that's the attorney for ANPAC, he sent a letter to Mr. Balin explaining the $10,000 offer in August of 2014. He said, in order to move forward, we have a disagreement, he said, about the value of this claim. In order to move forward, we want to do three things. Number one, we want your client to sign an authorization for medical records, not provide records. Mr. Balin seems to characterize this repeatedly as ANPAC insisted that Ms. Jelinek supply more records. That was not what was happening. And you got those signed authorizations in December? Yes, in December. And then there was the request for the examination under oath, and that didn't happen until March. And Mr. Balin also says, well, what did we learn in the EUO that we didn't know? Let me ask you, what investigation was occurring in April? What specific investigation was happening? What were you doing? Mr. Jackson had contacted a neuropsychologist and also, I believe, a neurologist in order to get, first of all, the raw data from Dr. Sanders and evaluate that, and then to set up the IME with both of those doctors so they could get a look at what was going on at that moment with Ms. Jelinek. Investigation by the claims adjuster, she had reviewed the records, she had reviewed the claims packet, they had been meeting with the claims committee and saying, we need more information, we need more information, we need more medical records if they're out there, we need the EUO, we need the IME. So that was the investigation, and the thing about it that's also sort of interesting is that on the one hand, it was August that we requested all these things. August of 2014, we requested those three things, just medical records and let's schedule an EUO and let's schedule an IME, but it took a really long time for Mr. Balin to cooperate. And there were letters going back and forth, et cetera, but at the same time, what we were trying to do, what the... You had a neuropsychologist lined up to review the records? To review the raw data. Did you have someone lined up to perform the IME? Yes, that neuropsychologist was going to perform the IME, and then there was also a neurologist that was going to be involved. So the IME that was proposed and that Mr. Balin refused to have Ms. Jelinek attend, the plan was to have it two days, both doctors. So why did you need the IME? It was still not clear from the medical records, from Dr. Sanders' records, what was the continuing problem that Ms. Jelinek was suffering from. Dr. Sanders said in October of 2013, this should resolve, this should go back to baseline. She should continue to have treatment for her anxiety and depression, and she should also look into cognitive rehabilitation. And so what ANPAC is looking for is, has it resolved now and why not? And if it hasn't resolved now, why isn't she treating, why isn't she looking for treatment? So there was, and also in the records, there was nothing to suggest that Ms. Jelinek had received any treatment for these cognitive difficulties. She didn't, as far as we know, she didn't get any cognitive rehabilitation therapy. It had been nearly two years since the Sanders evaluation, but she had not apparently returned for retesting, as was suggested. And so it wasn't clear to ANPAC where the valuation of the claim would come from. If she doesn't have any more medical expenses, her only medical expenses were $18,000, $18,600. Ten of those were paid in the MedPay claim. And then she received $100,000 from Country, the tortfeasors insurance. So from ANPAC's perspective, yes, even if her medical expenses and her losses were more than the $18,000 because of this brain injury, it was reasonable, it reasonably believed that $116,000 was an appropriate valuation of that claim. Can I ask you, I think I'm agreeing with everything you said up until this last point. Because it's after the offer of $10,000 in new money that it seems to me the problems arise for your client. Because I can certainly understand why your client wanted the deposition, and that's something that you had a right to insist on. But I don't, I guess I don't understand the district court's rationale for saying that once your client obtained the three and a half hour deposition, which provided answers to many of the questions you just posed that ANPAC was wondering about. And then the, seems like it's undisputed evidence that the person who was supposed to adjust the claim never actually reviewed the transcript itself. And the summary is a joke, frankly. That summary cannot substitute for reading the entirety of the transcript. And so I guess I find myself pretty, seems pretty easy to me that a reasonable jury could say that you can't make a kind of final $25,000 offer come April. Without at least having reviewed that transcript of the deposition that you insisted upon. Which provided answers to many of the questions relating to valuation that you just posed. And I understand that notion as far as having a responsibility to evaluate what was in the EUO. But Edith Elliott testified that she talked to Mr. Jackson about it. So Mr. Jackson was the one who took the EUO. She had also been to claim committee meetings where they talked about the problems with the treatment, the lack of treatment. How is this claim going to result in more than $116,000 losses in the future, et cetera. They had discussed this at these claims committee meetings. And they knew why they wanted the EUO. And then they had Dylan Jackson do it. And in the report back, she said she talked to him about it. And that the evaluation was they still didn't have enough information for it to know exactly what the medical, for example, what the medical opinion about her current condition would be. So why did you make the $25,000 offer if you didn't have all the information necessary to fully evaluate the claim? Well, I think, and what was needed to fully evaluate the claim would be the IME, would be the independent medical examination. Well, I know what you claim that you need to have it, but why did you make the offer if you didn't have all the information? Yeah, the offer was made at that time to avoid continuing litigation. It was, as Paula Letterman said, it was in an attempt to try to resolve the issue in a way that was satisfactory to both parties. Because there was not, there was no medical evidence, no evidence of out-of-pocket losses, no description of what she could be paying in the future. That would require the evaluation of the claim to be more than $210,000. But counsel, just, I mean, I don't know how you could read the transcript of that deposition and say that. Because what she confirmed is that contrary to what her doctor had told her a year plus prior, that this will resolve. I know you're scared now, this looks awful, but don't worry, this shouldn't be permanent. What it seemed clear by March of 2015 when the deposition was taken is that, no, this actually was not going to go away. And it had permanently, or not permanently, it had drastically affected the quality of her life. And I think, you know, as lawyers we can appreciate the loss of the ability to do, I can't remember the medical terms, like executive functioning, like high-level critical thinking for someone with her background and the line of work she was engaged in. For the rest of your life, when she was what, in her 50s? An extra $100,000 you don't think would be called for to compensate someone for permanent cognitive damage that was going to basically ruin the quality of their life going forward for the next 20, 30 years? I just, that to me, a reasonable jury could certainly find that, regardless of the dispute over the valuation, to not review carefully all of the information that she provided about her present condition during that deposition, which you had asked for, why, that just strikes me as the definition of unreasonable. At the same time, we had the second issue that there was a disconnect about in this case, that both Edith Elliott and Paula Letterman talked about, and is seen in the claims committee notes. And that second question is really causation. And because Ms. Chelinick walked away from the accident, and then later went to the ER, and she said she did not, she remembered the accident, she didn't hit her head, she didn't have vision or memory problems or anything like that. And then she came to her doctor later and said there were memory problems, and then a few months later, 90% better on the memory problems, and then by the time of the Dr. Sanders report, mild post-concussive disorder, complicated by anxiety and depression, and then very, I mean, honestly, by the time of the EUO, it sounds significantly different, much different. And the question as far as medical causation, Dr. Sanders, you know, she talked to her about what had happened in her past, said, you know, three bumps in the head, said the horse, incidents with the horses, that this is part of your past. But at the same time, there was no definite connection between, I mean, Dr. Sanders... And all the doctors she saw said that, no, the symptoms you are suffering now came from this car accident, not from some, I mean, I think she testified in the deposition that when she fell off the horse, she didn't even hit her head, and she was wearing a helmet, and so... She also testified she didn't hit her head in the car accident, I mean, that being part of the problem. Right, but I'm saying that, so she went to qualified, highly qualified medical doctors who ran all sorts of tests, did all sorts of evaluations, and if I'm remembering right, they all concluded that the reason you are having these symptoms is because of what you experienced during the car accident, no? My understanding of the deposition testimony of Edith Elliott and Paula Letterman is that there is a question of whether or not, that ANPAC felt that it was a question of whether or not the motor vehicle actually caused the accident, and that would be the purpose of the IME. Because in their experience and in the art of adjusting claims, they believe that this is not good enough, this is not enough evidence that it was necessarily connected. When you have these discrepancies, when you have the fact that she said she didn't hit her head, when you have the fact that the symptoms come and go over time, and when you have this, she hasn't been treating at all since February of 2014. So, yes, yes, I understand the idea that it is very significant the person of her educational background is experiencing these kinds of symptoms. At the same time, it was complicated by other things, anxiety and depression, that it may or may not have been a result of the accident. I believe Dr. Sanders' report, it does not necessarily say, I'm sure this was caused by the accident. So you're relying on, you're waiting for the IME to make a determination on causation? Yeah, I mean, to say, is this a... Is it required to submit to an IME if you request one? Yes, and that's the thing... Had you set up an IME and requested it? Yes, we had set up the IME, we requested it, we had requested it as early as August... And I see that there was a request, but what specifically was it said, this is the doctor that's going to perform the IME and it's set for this date? Yes, it is, and I can find it in the record if I had more time, but it's in the letters, I believe in the excerpts of the record. And Mr. Berlant said that she's not going to show up, is that what happened? Right, exactly. And the point being, we had a contractual... It may have had a five... April or... June of 2015. So the plan was, after they finished the EUO, they were going to actually, they had actually scheduled, they said, in this office, in Olympia, these are the dates we're holding, it was requested. And I just wanted to point out that ANPAC had a contractual right to have medical authorizations, to have the EUO and to have an IME before making a decision on whether or not to pay. That's in the contract, in the policy, and they attempted to exercise that right away in July, in August, when Mr. Berlant rejected the first offer. And that time frame was stretched out because Mr. Berlant refused to cooperate and extended the time limit. And then at the time, between the time of the EUO and the second offer in the lawsuit, the question was, will you please submit to this IME that we've scheduled so we can complete this investigation, so we can have all the information that we need and go forward in valuing the claim. Can I ask you, though, about the April 21 email then from Mr. Jackson? Because I guess everything you're saying now sounds perfectly reasonable, but it seems to me a reasonable jury could look at the text of what's stated in that email and conclude that actually everything you've just said is not what ANPAC was considering, because in connection with making the $25,000 offer, what is stated is that this offer is the most that ANPAC will pay. So you're claiming that, oh, well, no, we needed all this information, we were trying to do this, we were trying to exercise our right to run the policy. But I think a reasonable jury could conclude, looking at the way this email is phrased, if you're trying to find it, it's kind of the, I think it's the fourth paragraph down the last sentence in the email. And what I, what? No, it's the paragraph that begins, if necessary, and just read the last sentence. If, just read the last sentence. Right. So what I read that, again, maybe you're right, maybe you're wrong, but a reasonable jury could infer from that that, no, what your client had decided was, look, this is a nuisance, we'll give you $25,000 if you'll just shut up and go away, but this is it. Stop making demands. We are done negotiating. Take it or leave it. And that's totally inconsistent with everything you just said a second ago. At the same time, what also had been happening through all this time is Mr. Jackson had repeatedly said to Mr. Balin, we don't think this is worth $210,000. Please give us a counteroffer. We offered you $10,000 new money based on 116-667. If you don't like that, tell us why. And he never came back. He did not want to negotiate. And also, the tenor of these letters are ratcheting up in nastiness, quite honestly, with Mr. Balin threatening a lawsuit in almost every letter and filing the IFCA claim, et cetera. And when you read the depositions as well, there's a lot of getting after each other, the lawyers. So that's the tone of what's going on here. And at the same time, Mr. Jackson has said ANPAC's not going to negotiate against itself. We gave you an offer. Give us an offer so we can make an adjustment. We want to negotiate. I think we have your argument. Any more questions by counsel? We've let you go over quite a bit because the Court has questions. You have some rebuttal time. I told her we'd give you a little bit more, so we'll give you two minutes instead of the one. I appreciate it. Could I have ten? It's very interesting in the insurance industry and the WACs require that every important item in a claims adjustment file be documented. There is no documentation in the file that the adjuster ever looked at the medical records made available to her. We know the third set wasn't reviewed because it was never even provided to her. A reasonable investigation requires that you at least read the materials that are available to you so you can evaluate a case. There is no evidence here, anywhere, that they evaluate it. Let me ask you this. Is it your position that ANPAC had to rely solely on the reports from the treating doctors and the statement from the insured and shouldn't have been allowed to do an IME? No. I'm really basically saying that they didn't do any investigation at all. Let's look at the offers. The offer is $10,000. The offer is $25,000, where that's going to be the final and most we're ever going to pay. Isn't an IME a part of an investigation? If they're truly concerned about causation and the extent of the damage to your client, wouldn't an IME be the reasonable thing to do to investigate that? I just want to talk about the offers for a second and then we'll go back to the IME issue, because an IME didn't happen here until afterwards. The claims, the offers that were made, $10,000, $25,000, were not based on any evaluation of the medical records or the damages or the examination and growth. They were admittedly only to save costs for ANPAC. In other words, ANPAC, really a jury could find in this case that ANPAC never even considered the real damages to Ruth Jelinek, never even looked at it. And the documentation does not support that anyone looked at any of those records at any time. They threw out a $10,000 offer on a brain damage case and then a $25,000 offer based on nothing, no evaluations. And the fact that it was like a four line description of the deposition goes along with what you're saying. She cries a lot. Your time is up. Let me ask if my colleagues have any questions. I think you both have argued your case well. We thank you for your fine work. The case just argued is submitted.
judges: M. Smith, Watford, Rayes